**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |
|---|
| In re: |
| WEISS MULTI-STRATEGY ADVISERS LLC, *et al.*, |
| Debtors. |

**NOT FOR PUBLICATION**

Case No. 24-10743 (MG)

Chapter 11

---

### MEMORANDUM OPINION AND ORDER DENYING WITHOUT PREJUDICE MOTION OF JEFFERIES STRATEGIC INVESTMENTS, LLC AND LEUCADIA ASSET MANAGEMENT HOLDINGS LLC TO CONVERT CASES TO CASES UNDER CHAPTER 7

**A P P E A R A N C E S :**

HERBERT SMITH FREEHILLS
*Attorneys for Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*
450 Lexington Avenue
New York, New York 10017
By:    Scott S. Balber, Esq.
       Michael P. Jones, Esq.

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for the Debtors*
200 West 41st Street, 17th Floor
New York, NY 10036
By:    Tracy L. Klestadt, Esq.
       John E. Jureller, Jr., Esq.
       Lauren C. Kiss, Esq.
       Stephanie R. Sweeney, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 20) of

Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC

("LAM Holdings," and with JSI, the "Jefferies Entities"), seeking entry of an order converting

the chapter 11 cases of Weiss Multi-Strategy Advisers LLC ("WMSA") and its co-debtors

(collectively, the "Debtors") to cases under chapter 7 pursuant to sections 105(a) and 1112 of the

Bankruptcy Code.  Annexed to the Motion is the declaration of Nicholas Daraviras, co-president

of LAM Holdings, in support of the Motion (the "Daraviras Declaration," ECF Doc. # 20-3).

The Debtors filed an opposition (the "Opposition," ECF Doc. # 39) to the Motion, which

is supported by the declarations of Jeffery Dillabough (the "Dillabough Declaration," ECF Doc.

# 40), general counsel to the Debtors, and Michelle Lanzoni (the "Lanzoni Declaration," ECF

Doc. # 41), controller of the Debtors.  The Jefferies Entities filed a reply (the "Reply," ECF Doc.

# 46) in further support of the Motion.  Annexed to the Reply is the declaration of Scott. S.

Balber (the "Balber Declaration," ECF Doc. # 46-1) and the supplemental declaration of

Nicholas Daraviras (the "Daraviras Supplemental Declaration," ECF Doc. # 46-3).

On May 28, 2024, the Court held a hearing on the Motion.

For the reasons explained below, the Motion is **DENIED WITHOUT PREJUDICE.**

## I.    BACKGROUND

### A.  Overview of the Debtors' Businesses

Debtor GWA, LLC ("GWA") is a holding company and the parent (in whole or in part)

of the other Debtor entities.  (*Declaration of Pierce Archer, Senior Vice President and Chief

Operating Officer of the Debtors Pursuant to Local Bankruptcy Rule 1007-2 in Support of

Chapter 11 Petitions*, ECF Doc. # 4 (the "First Day Declaration") ¶ 12.)  Debtor WMSA serves

as a discretionary investment adviser to a number of private investment funds organized by

WMSA, a mutual fund and a UCITS fund.  (*Id.* ¶ 18.)  WMSA also advises managed accounts

owned by institutional investors over which it exercises sole investment discretion.  (*Id.*)  Debtor

OGI Associates LLC ("OGI") is an investment company that contains GWA's excess capital.

(*Id.* ¶ 20.)  Weiss Special Operations ("WSO") was established to provide administrative

services for the investment funds, but has been in the process of liquidating its assets since 2016. (*Id.* ¶ 22.)

### B. Events Leading Up to the Commencement of the Chapter 11 Cases

#### 1. Debtors' Prepetition Agreements with Jefferies

GWA, the parent company of the remaining Debtors, entered into two note purchase agreements, three series of notes, and a strategic relationship agreement (the "Strategic Relationship Agreement") with the Jefferies Entities. (Motion ¶ 8.) The Jefferies Entities submit that the Debtors owe approximately $100 million in liabilities to the Jefferies Entities on account of these agreements. (*Id.*)

On May 1, 2018, LAM Holdings and GWA entered into the Strategic Relationship Agreement pursuant to which GWA agreed, under certain conditions, to share defined amounts of realized profits and revenue with LAM Holdings.[1] (Daraviras Declaration ¶ 3.) The Jefferies Entities' records reflect that GWA owes LAM Holdings $50,902,392.00 of revenue sharing fees on account of the Strategic Relationship Agreement. (*Id.* ¶ 4.)

In connection with the Strategic Relationship Agreement, the Debtors indicate that WMSA and JSI entered into the Investment Management Agreement, dated May 1, 2018 (the "IMA"). (Opposition at 6.)

On December 3, 2019, JFG Funding LLC ("JFG Funding") and debtor GWA entered into a note purchase agreement (the "2019 Note Purchase Agreement) pursuant to which GWA issued $50 million in notes (the "2019 and 2020 Notes") to JFG Funding. (Motion ¶ 5.) These

---

[1]    The Opposition indicates that the LAM Holding LLC was the party that initially entered into the Strategic Relationship Agreement with GWA. (Opposition at 6.) LAM Holding LLC subsequently assigned all of its rights under the Strategic Relationship Agreement to LAM Holdings (as defined herein) pursuant to an Assignment and Assumption Agreement, dated as of October 18, 2018. (*Id.*) LAM Holding LLC then subsequently merged with and into LAM Holdings (as defined herein) on December 1, 2021 with LAM Holdings as the surviving company. (*Id.*)

notes include a $31,250,000 note dated December 3, 2019 and an $18,750,000 note dated January 13, 2020.  (Opposition at 7.)  JFG Funding subsequently assigned its interest in the 2019 Note Purchase Agreement to JSI, which GWA acknowledges.  (Motion ¶ 6.)

In late 2021, JSI entered into a forbearance agreement with GWA, whereby it agreed to not immediately call the 2019 and 2020 Notes.  (Daraviras Declaration ¶ 8; Motion ¶ 10.)  JSI also entered into an amendment to the Strategic Relationship Agreement.  (Motion ¶ 10.)

On September 21, 2022, GWA and JSI entered into a second note purchase agreement (the "2022 Note Purchase Agreement"), whereby GWA issued a note to JSI in the principal amount of $3,000,000 (the "2022 Note" and, together with the 2019 and 2020 Notes, the "Notes").  (Daraviras Declaration ¶ 9.)  Separately, JSI entered into additional forbearance agreements with GWA, executed on September 21, 2022 and July 25, 2023, whereby JSI agreed to forbear from "exercising certain rights to call for the immediate payment on the Notes."  (*Id.* ¶ 10.)

On December 21, 2023, JSI exercised its option under the 2019 and 2022 Note Purchase Agreements to redeem the full amounts owed under the Notes.  (*Id.* ¶ 12; *see also* Opposition at 7 (indicating that JSI delivered the Notice of Optional Redemption to GWA on December 21, 2023).)  As of March 31, 2024, GWA owed JSI a total of $50,393,178.00 under the Notes. (Daraviras Declaration ¶ 12.)

The Jefferies Entities submit that the amounts owed represent approximately 92% of the Debtors' total liabilities.  (Motion ¶ 9.)  The Jefferies Entities indicate that GWA's records reflect that, as of 2022, these obligations represented approximately 90% of GWA's "Long Term Liabilities," exclusive of non-bonus compensation owed to employees.  (*Id.* (citing to GWA's 2022 consolidated financial statements annexed to the Daraviras Declaration as Exhibit A).)

This figure has since risen to more than 93% by December 31, 2023.  (*Id.* (citing to GWA's 2023 consolidated financial statements annexed to the Daraviras Declaration as Exhibit B).)

The Debtors state that JSI was, at all relevant times, an unsecured creditor of GWA and WMSA.  (Opposition at 7.)  There were no guarantees under the Note Purchase Agreements or the Notes.  (*Id.*)  Further, at all relevant times, LAM Holdings was an unsecured creditor under the Strategic Relationship Agreement.  (*Id.*)  None of these agreements were guaranteed by any other party.  (*Id.*)

2. <u>Negotiations Between the Debtors and the Jefferies Entities</u>

In late 2023 and early 2024, the Jefferies Entities engaged in discussions with the Debtors regarding (i) the Debtors' financial situation, including their increasing insolvency, and (ii) how to address the Debtors' indebtedness to the Jefferies Entities.  (Daraviras Declaration ¶ 13.)

Debtors' senior management team requested that the Jefferies Entities defer taking any steps to enforce their contractual rights, including refraining from initiating a lawsuit against the Debtors.  (*Id.*)  Additionally, the Debtors' senior management team—including, the Debtors' Chief Executive Officer, George Weiss—informed the Jefferies Entities that the Debtors were pursuing a new "strategic relationship" with a large, institutional multi-fund manager, and that the capital raised from that relationship would be used to pay down debt owed to the Jefferies Entities.  (*Id.* ¶ 14; Motion ¶ 11.)

The Jefferies Entities state that, based on those representations, they elected to not pursue the remedies available to them at that time.  (*Id.*)  Nonetheless, the Jefferies Entities requested that Debtors not make unnecessary payments or otherwise prioritize the payment of other creditors above the debts owed to the Jefferies Entities until the conclusion of the transaction with the multi-fund manager.  (*Id.*; Daraviras Declaration ¶ 15.)

### 3.  The Debtors' Payment of Employee Bonuses

In early 2024, the Jefferies Entities learned that the Debtors were intending to pay, at the end of February 2024, approximately $30 million in bonuses and employee compensation, comprised of $2.7 million in "management fees," $8 million in staff and management bonuses, and $19.6 million in "strategy payouts."  (Daraviras Declaration ¶ 16.)  This planned payment was notwithstanding that the Debtors (i) owed JSI approximately $50.3 million under the Notes and (ii) were insolvent.  (Motion ¶ 12.)

The Jefferies Entities notified the Debtors' management team that they objected to the making of such payments before additional capital had been raised and the debt owed to the Jefferies Entities had been repaid.  (Daraviras Declaration ¶ 17.)  The Debtors' executives represented that they would not make such payments until the end of February 2024.  (*Id.* ¶ 18.)

Based on these representations, including the anticipated influx of capital from the multi-fund manager's investment, the Jefferies Entities sent the Debtors a draft forbearance agreement. (*Id.* ¶ 19; Motion ¶ 13.)  The draft forbearance agreement prohibited the Debtors from paying, granting, or transferring bonus compensation to any of their employees.  (*Id.*)  When Debtors did not respond, the Jefferies Entitles followed up.  (Daraviras Declaration ¶¶ 19–20.)  In subsequent email correspondence, Jeffrey Dillabough, debtor Weiss Multi-Strategy Advisers LLC's general counsel, assured JSI on February 9, 2024 that the Debtors were "operating the business in the normal course."  (*Id.* ¶¶ 20–21, Ex. C at 1; Motion ¶ 14.)

Notwithstanding the foregoing, the Debtors' management team, in fact, made nearly $30 million in bonus payments to 96 of their employees on February 8, 2024 "without any notice to or discussion with the Jefferies Entities" and "weeks ahead of schedule."  (Daraviras Declaration ¶ 22 (indicating that the Jefferies Entities learned of the payments on February 11, 2024); Motion ¶ 15.)

6

4.  The 2024 Forbearance Agreement and Announcement of Liquidation

After disclosing the bonus payments, the Debtors' management team again requested that the Jefferies Entities forbear from exercising any rights and remedies against the Debtors, including initiating litigation.  (Daraviras Declaration ¶ 23; Motion ¶ 16.)  In response, on February 12, 2024, the Debtors executed a further forbearance agreement (the "2024 Forbearance Agreement").[2]  (Daraviras Declaration ¶ 24.)  In that agreement, the Debtors "acknowledged that their obligations under the Notes were past due, and each of the Debtors guaranteed GWA's obligations to the Jefferies Entities."  (Motion ¶ 16.)  Additionally, the Debtors "agreed to provide the Jefferies Entities with a security interest in effectively all the Debtors' property."  (Daraviras Declaration ¶ 24.)

The Debtors subsequently announced that they would cease operations, terminate their advisory and affiliated businesses, close the managed funds, begin the process of returning capital to clients, liquidate assets, and distribute the majority of proceeds to investors.  (Motion ¶ 17.)  According to the Motion, the Debtors have not made any effort to "preserve assets for the benefit of the Debtors' creditors," including clawing back the $30 million paid in bonuses to employees.  (*Id.* ¶¶ 18–19; *see also* Daraviras Declaration ¶ 26 (indicating that Debtors' management team said that taking action to claw back the $30 million was a "non-starter").)  The Motion also asserts that Debtors have continued to "deplete estate assets," making payments to various entities, with no explanation "as to why these expenses should have been paid ahead of amounts that the Debtors owe to the Jefferies Entities."  (Motion ¶ 20.)

---

[2]      The Opposition indicates that this forbearance agreement was an amendment to a prior forbearance agreement.  (Opposition at 10.)

5. <u>April 2024 Settlement Negotiations</u>

After the Debtors' disclosures, the parties continued to negotiate the Debtors' obligations to the Jefferies Entities. (Daraviras Declaration ¶ 29.) During these discussions, the Jefferies Entities advised that the Debtors that a chapter 7 bankruptcy proceeding would be the "appropriate mechanism to resolve Debtors obligations to all creditors and indicated that the Jefferies Entities would file an involuntary proceeding if the Debtors did not do so." (*Id.*) However, the Debtors pressed that the Jefferies Entities not pursue an involuntary chapter 7 bankruptcy proceeding or initiate any other litigation proceedings. (*Id.*) Instead, the Debtors argued that a consensual resolution would be beneficial to the Debtors' estate and their creditors. (*Id.*)

On April 18, 2024, the Debtors' Chief Executive Officer, George Weiss, reached an agreement-in-principle to pay the Jefferies Entities a "small" percentage of what the Jefferies Entities are owed in exchange for the Jefferies Entities' agreement to defer pursuing litigation. (Motion ¶ 22; Daraviras Declaration ¶ 30.) The terms of this agreement were memorialized in an email sent to the Debtors' current management in late April 2024. (Motion ¶ 22; Daraviras Declaration ¶ 31.)

## C. The Chapter 11 Filing

Shortly after receiving the term sheet reflecting the agreements, George Weiss advised that he would be unable to make the initial payment. (Motion ¶ 23.) The Jefferies Entities "offered to work on something creative to keep a potential resolution alive and avoid litigation." (Daraviras Declaration ¶ 32.) The Jefferies Entities contend that the offer was rebuffed, and the Debtors filed voluntary petitions for chapter 11 relief on April 29, 2024 (the "Petition Date"). (*Id.* ¶¶ 32–33.)

On May 17, 2024, the U.S. Trustee filed the *Notice of Inability to Appoint an Official Committee of Unsecured Creditors* (the "UST Notice," ECF Doc. # 33).  The notice indicates that, "despite diligent efforts to solicit interest from eligible holders of unsecured claims, there has not been sufficient willingness to serve on a committee of unsecured creditors in these Chapter 11 cases."  (UST Notice at 1.)

### D.  The Debtors' Adversary Proceeding Against Jefferies

Along with the chapter 11 filing, the Debtors commenced an adversary proceeding (the "Adversary Proceeding," and the complaint, the "Adversary Complaint," Adv. Pro. No. 24-01350, ECF Doc. # 1) against the Jefferies Entities.  The Adversary Complaint seeks (i) judgment avoiding as a preferential transfer and/or fraudulent conveyance the 2024 Forbearance Agreement and any security interest granted or perfected in furtherance thereof.[3]  The Debtors submit that the 2024 Forbearance Agreement provided the Jefferies Entities, who were "at all times unsecured creditors without any guarantees," with, among other things (i) a first priority security interest in all of the Debtors' assets; (ii) joint and several guarantees by each of the Debtors (whether party to the Notes or not); and (iii) an offset on any fees that JSI owes to GWA or any other Debtor under the IMA, in exchange for a forbearance for two business days.  (Adversary Complaint ¶ 1.)

In addition, the Debtors seek a "money judgment relating to certain avoidable transfers" in the aggregate amount of $20 million, comprised of (i) $3 million payment made by OGI to JSI in the 90-day and two-year period before the Petition Date and (ii) $17 million in payments from GWA to JSI during the two-year period before the Petition Date.  (*Id.* ¶ 2.)  The transfers from

---

[3]    The Debtors indicate that they never received a fully executed copy of the 2024 Forbearance Agreement. (Adversary Complaint at 2 n.1.)

GWA are comprised of three payments from GWA to JSI in the amounts of $5 million, $10 million, and $2 million each.  (*Id.*, Schedule 1.)

### E.  The Motion

The Jefferies Entities' Motion seeks to convert the Debtors' chapter 11 cases to ones under chapter 7 of the Bankruptcy Code on three grounds: (i) the Debtors' chapter 11 filing was made in bad faith; (ii) the Debtors are facing substantial or continuing losses to or diminution of the estate and there is no reasonable likelihood of rehabilitation; and (iii) the Debtors have and will continue to mismanage the estate.  (Motion ¶ 27.)  The Jefferies Entities further reserve their rights to pursue Rule 11 sanctions against the Debtors' advisors and seek the return of attorneys' fees paid in connection with the commencement of these chapter 11 cases.  (*Id.* at 8 n.4.)  Finally, they argue that an independent chapter 7 trustee should be appointed.  (*Id.* ¶ 35.)

1.  <u>The Motion Argues That the Chapter 11 Cases Constitute a Bad Faith Filing</u>

The Jefferies Entities argue that there are "at least four indicia" that the Debtors' chapter 11 cases were filed in bad faith.  (*Id.* ¶ 30.)

*First*, the Debtors do not intend to reorganize as they have publicly announced their intention to wind down their business before the chapter 11 cases were filed and have no assets or future operational plans.  (*Id.* ¶ 31.)

*Second*, this is a two-party dispute between the Debtors and the Jefferies Entities, and the cases do not involve "conflicting liabilities that outnumber a finite amount of resources."  (*Id.* ¶ 32.)  The Jefferies Entities highlight that GWA's debts to the Jefferies Entities and their affiliates constitute over 93% of GWA's "Long Term Liabilities," exclusive of compensation owed to employees.  (*Id.*)

*Third*, the timing of the Debtors chapter 11 filing, "after reneging on their agreement and being warned by the Jefferies Entities that litigation was imminent," reflects the Debtors' bad faith. (*Id.* ¶ 33.)

*Fourth*, the Jefferies Entities allege that the Debtors made "demonstrably false statements in court filings . . . in these [c]hapter 11 cases." (*Id.* ¶ 34.) With respect to $17 million of the alleged preferential and/or fraudulent transfers identified in the Adversary Complaint from GWA to JSI, the Jefferies Entities assert that these amounts were made to "pay down amounts owed to JSI" and were therefore, on account of an antecedent debt. (*Id.*)

### 2.   The Motion Argues the Debtors Have No Intention to Reorganize

The Jefferies Entities argue that cause exists to convert these cases pursuant to section 1112(b)(4)(A) as there is both "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." (*Id.* ¶ 36 (quoting 11 U.S.C. § 1112(b)(4)(A)).) With respect to the first element, the Jefferies Entities highlight the Debtors' payment of hundreds of thousands of dollars in costs to creditors other than the Jefferies Entities. (*Id.* ¶ 39.) Proceeding in chapter 11 would only result in additional expenses. (*Id.*) The Jefferies Entities contend that the Debtors have self-created a situation where they will possess negative post-petition cash flow with no hope of recovery. (*Id.*) As to the second element, the Debtors have admitted that they have no intention—or ability for that matter—to be rehabilitated. (*Id.* ¶ 40.)

### 3.   The Motion Argues the Debtors Have Grossly Mismanaged the Estate

The Jefferies Entities also seek conversion pursuant to section 1112(b)(4)(B) of the Bankruptcy Code, which authorizes conversion when there is "gross mismanagement of the estate." (*Id.* ¶ 41 (quoting 11 U.S.C. § 1112(b)(4)(B)).) Here, the Jefferies Entities contend, the Debtors' refusal to pursue claims against the recipients of the $30 million in employee bonuses,

which may be the sole remaining assets available to the Debtors' estate, constitutes gross

mismanagement and warrants conversion.  (*Id.* ¶¶ 44–45.)

### F.  The Debtors' Opposition

The Debtors oppose the Motion on grounds that the Jefferies Entities have "provided no

material facts or law to support their arguments."  (Opposition at 15.)  In the Opposition, the

Debtors highlight that the Jefferies Entities, who share in similar fiduciary and regulatory

obligations as the Debtors, continued to invest in the Debtors "until the end" and reached

positive income on their investments in 2023 and 2024.  (*Id.* at 2.)  Additionally, the Debtors

engaged the Jefferies Entities in good faith, and it was the Jefferies Entities that took actions

"counterintuitive" to any settlement negotiations (*i.e.*, threatened clawback litigation re employee

compensation, threatened filing of fraud claims against D&Os, and forcing the Debtors to sign

the 2024 Forbearance Agreement).  (*Id.* at 3.)

1.  The Debtors Argue that Chapter 11 Was an Exercise of the Debtors' Business Judgment

The Debtors argue their decision to seek bankruptcy relief was predicated on their

business judgment.  (*Id.* at 15.)  Additionally, the winding down of their operations is being done

consistent with their fiduciary obligations and in compliance with strict regulatory requirements.

(*Id.*)  These regulatory requirements and obligations include (i) the applicable provisions of the

Investment Advisers Act of 1940, which require maintaining segregated accounts, certain filings,

the appointment of a registered investment adviser, and certain auditing, among other things; (ii)

the Commodity Exchange Act of 1936, which requires the filing of certain reports; (iii) the

Securities Exchange Act of 1934, which requires "numerous continuous filings" by WMSA; (iv)

the Investment Company Act of 1940, which requires the submission of filings to the Securities

and Exchange Commission (the "SEC") in connection with the fund's windup; and (v) certain

filings with the Federal Reserve Bank of New York on behalf of the U.S. Department of

Treasury relating to certain cross-border transactions of the Debtors or its clients. (*Id.* at 17–20.)

The Debtors indicate that their bankruptcy was "compelled . . . due to, in large part,

actions taken by the Jefferies [Entities]." (*Id.* at 15.)  These actions include the (i) alleged

outright rejection of the third-party financial investment by the Jefferies Entities that eliminated a

strategic relationship and potential capital infusion and (ii) the Jefferies Entities' threatened

lawsuit to seek payment of the Debtors' obligations and the clawback of employee

compensation. (*Id.* at 15–16.)  Indeed, the Jefferies Entities, the Debtors submit, were fully

aware of all these facts. (*Id.* at 16.)

The Debtors believe that their current management and professionals, who possess "years

of experience with the Debtors and extensive knowledge of the Debtors' operations, are best

equipped to oversee and carry out the winding up process." (*Id.* at 20.)  Such individuals would

ensure the Debtors' compliance with the rules and regulations set forth above.  The Debtors deny

the Jefferies Entities' suggestion of "gross mismanagement" and indicate that they have engaged

the required professionals to provide the "necessary, bankruptcy, regulatory, tax/audit, and

litigation legal and professional services" that would have been required even if a chapter 7

trustee was appointed. (*Id.* at 20–21.)  The Debtors submit that having unqualified or

unsupervised personnel to execute transactions and make necessary regulatory filings risks

breaching their fiduciary duties and applicable law. (*Id.* at 21.)

    2.    The Debtors Argue the Jefferies Entities Fail to Articulate Any Support for
          Conversion

The Debtors argue that the Motion fails to support a conversion of the Debtors'

bankruptcy cases to chapter 7 as these cases were not filed in bad faith, there was no

"plundering" of the estates by the Debtors supporting conversion under section 1112(b)(4)(A),

and there is no evidence of gross mismanagement supporting conversion under section

1112(b)(4)(B).

### a.   There is No Evidence of Bad Faith

The Debtors argue that these chapter 11 cases were not filed in "bad faith" as:

- the orderly wind down and liquidation of the estate is an "appropriate use of chapter 11" for the Debtors who are investment advisors and whose "primary remaining business is to oversee the orderly liquidation and distribution of assets . . . in accordance with strict regulatory requirements, continuing fiduciary obligations, and significant expertise";

- winding down in chapter 11 is a "prudent use" of the Debtors' business judgment in light of their fiduciary obligations and applicable regulatory restrictions and requirements, which served as a "material consideration" in their decision to pursue a wind down in chapter 11; and

- the bankruptcy cases were not filed "solely to avoid or adjudicate a two-party dispute" as the cases extend beyond the dispute between the Debtors and the Jefferies Entities and there are other creditors and stakeholders who need chapter 11 protections, including lessors, vendors, contract counterparties, employees, and the Debtors' clients.

(*Id.* at 22–23.)  Any allegations that the Debtors are targeting Jefferies, the Debtors submit, is

without merit.  (*Id.* at 23–24.)  The Debtors further note the following:

- the Adversary Proceeding was commenced in line with the Debtors' obligation to set aside (i) the purported security interest granted to the Jefferies Entities provided as part of the 2024 Forbearance Agreement and (ii) the possible fraudulent transfer or preference payments made to the Jefferies Entities;

- the Debtors initially began preparing for chapter 11 in February 2024 when the Jefferies Entities rejected the proposed third-party capital investment and threatened litigation that would have triggered indemnification obligations; and

- the Debtors earnestly prepared for bankruptcy in March 2024 when it became evident that an orderly wind down could not occur outside of court due to the Jefferies Entities, the Debtors' significant fiduciary obligations, and governing regulatory requirements for the wind down of the Debtors' business and affairs.

(*Id.* at 24–25.)

The Jefferies Entities, the Debtors indicate, were notified at the beginning of March that a

bankruptcy filing was "imminent."  (*Id.* at 25.)  The parties continued in good faith settlement

negotiations that terminated when the parties were unable to reach settlement by a "self-imposed" deadline the Jefferies Entities created. (*Id.*)  It was the termination of settlement negotiations, the Debtors contend, which "necessitat[ed] the filing of the Bankruptcy Cases." (*Id.*)

Additionally, the Debtors' entry into the 2024 Forbearance Agreement was a product of "duress" and the product of the Jefferies Entities' efforts to advance their position above all other general unsecured creditors. (*Id.* at 3.)  Indeed, the Jefferies Entities agreed to a "mere two-day forbearance period" as part of the 2024 Forbearance Agreement. (*Id.* at 4.)

Finally, the Jefferies Entities, the Debtors argue, mischaracterize the language in the Adversary Complaint in arguing that the Debtors made false statements in court filings that the "Avoidable Transfers were not made on account of an antecedent debt." (*Id.* at 25–26.)  They assert that the Jefferies Entities failed to acknowledge later statements in the Adversary Complaint to the alternative. (*Id.* at 26.)

> ### b. There Was No Plundering of the Debtors' Estates and No Basis for Conversion Under Section 1112(b)(4)(A)

The Debtors argue that there are no "continuing and increasing losses" and it is premature at this stage, in cases filed only a month ago, to determine that there is no reasonable likelihood of rehabilitation.  Accordingly, conversion under section 1112(b)(4)(A) is unwarranted.

*First*, the Debtors are winding down and the actions taken in connection therewith were done to satisfy the Debtors' fiduciary obligations. (*Id.* at 27.)  The Debtors highlight that they are, in fact, receiving income from obligations relating to their operations and continue to eliminate unnecessary costs. (*Id.*)  The payments the Jefferies Entities highlight in support of their position that there are continuing losses were pre-petition payments that are irrelevant when determining whether there is a continuing loss or diminution of the estate. (*Id.* at 27–28.)

*Second*, these cases have only been pending for a month.  Accordingly, the Debtors contend that the Court should find a "reasonable likelihood of rehabilitation" and provide the Debtors an opportunity to attempt confirmation of a plan of liquidation.  (*Id.* at 28.)  The Debtors note that they are already preparing a budget for these chapter 11 cases.  (*Id.* at 29.)

### c.  There is No Evidence of Gross Mismanagement in Support of Conversion Pursuant to Section 1112(b)(4)(B)

The Jefferies Entities' sole articulated basis in support of a finding that there is sufficient gross mismanagement to justify conversion is "completely inaccurate," the Debtors contend.  (*Id.* at 30.)  In support, the Debtors state that (i) the bankruptcy cases had only been pending for one week at the time of the Motion and there is no requirement that an action be commenced within that timeframe; (ii) the U.S. Trustee is unable to appoint a committee, which may change over the course of these cases; (iii) if there are claims that the Debtors do not pursue and creditors seek to pursue such claims on behalf of the estate, the Court will make a standing determination at that time; and (iv) the payments to employees were made in the ordinary course, were standard, and were proper in both timing and amount.  (*Id.*)

### G.  The Reply

The Jefferies Entities reiterate that the Debtors' lack of intent to reorganize supports a conversion of these chapter 11 cases.  (Reply ¶¶ 3, 10, 14–15.)  They assert that use of chapter 11 to facilitate an orderly liquidation in compliance with the fiduciary obligations and regulatory controls is an insufficient basis to permit the Debtors to remain in chapter 11.  (*Id.* ¶¶ 11, 15.)  Additionally, there is also no support, the Jefferies Entities contend, that the Debtors' business judgment is relevant and, to the extent it is, how a chapter 7 trustee would be less capable than the Debtors' current management.  (*Id.* ¶¶ 3, 8, 12.)

Rather, the Jefferies Entities contend that these chapter 11 cases are bad faith filings for the following reasons: (i) the Debtors confirm that they have no plans to reorganize (*id.* ¶¶ 14–15); (ii) the Debtors have failed to show how these cases are not a two-party dispute since the Jefferies Entities are the "only meaningful creditor" (*id.* ¶¶ 16–18); (iii) the Jefferies Entities are receiving disparate treatment, and they are precluded from pursuing avoidance claims (*id.* ¶ 19); (iv) the Debtors have failed to overcome the assertion the timing of the Debtors' filing reflects an attempt to "delay or thwart" (*id.* ¶¶ 20–21); and (v) the Debtors continue to make misstatements in their filings, including alleging that the $17 million in transfers to the Jefferies Entities was not on account of antecedent debt and arguing that the Jefferies Entities "flatly rejected" the third-party financing, which they assert is outright false (*id.* ¶¶ 22–23).

Finally, the Jefferies Entities again argue grounds for conversion also exist pursuant to sections 1112(b)(4)(A) and (b)(4)(B) since the Debtors are liquidating and continue to diminish the estate and have no intention of rehabilitating (*id.* ¶¶ 24–27), and management is facing a conflict of interest in pursuing the $30 million in avoidable transfers, which constitutes gross mismanagement of the estate (*id.* ¶¶ 28–29).

## II.    LEGAL STANDARD

### A.  Section 1112(b) Generally

Section 1112(b) of the Bankruptcy Code provides that, subject to certain exceptions:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1); *see also* 11 U.S.C. §§ 1112(b)(2), 1112(c) (establishing certain exceptions to section 1112(b)(1)).

Section 1112(b)(4) sets forth 16 items that constitute "cause" under section 1112(b):

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

Courts have recognized, however, that the list is "not exhaustive" and other factors may

be considered.  *See In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y.

2009) ("The list contained in § 1112(b) 'is not exhaustive.  The Court will be able to consider

other factors as they arise, and to use its equitable powers to reach an appropriate result in

individual cases.'" (quoting H.R. REP. NO. 95-595 at 405–06 (1977))); *In re AdBrite Corp.*, 290

B.R. 209, 216–17 (Bankr. S.D.N.Y. 2003) ("A finding of cause is not limited to the grounds

stated in 1112(b).").

Generally, the moving party has the burden of demonstrating cause for conversion by a

preponderance of the evidence.  *AdBrite*, 290 B.R. at 218 (noting that the party moving to

dismiss or convert a chapter 11 case "bears the burden of proving that cause exists by a

preponderance of the evidence").  Once cause has been established, a court has "broad discretion

to either convert or dismiss the Chapter 11 case."  *Id.* at 215.  Section 1112(b), however, does not

establish a "bright-line test to determine when conversion or dismissal is in the best interests of

creditors and the estate."  *In re Rubio*, No. 09-75163 (AST), 2011 WL 124458, at *4 (Bankr.

E.D.N.Y. Jan. 13, 2011).

### B.  Relevant Grounds for Establishing Cause Under Section 1112(b)(4) of the Bankruptcy Code

#### 1.  Section 1112(b)(4)(A) – Diminution of the Estate and Absence of a Reasonable Likelihood of Rehabilitation

Section 1112(b)(4)(A) provides that cause for conversion or dismissal is established if

there is a (i) "substantial or continuing loss to or diminution of the estate" and (ii) an "absence of

a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A); *see also In re 1031 Tax*

*Grp., LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) (citation omitted) (stating that both elements

must be satisfied).

"In determining whether a substantial or continuing loss to, or diminution of, the estate exists, a court must make a full evaluation of the present condition of the estate, not merely look at the Debtor's financial statements." *In re Adamo*, No. 14-73640 (LAS), 2016 WL 859349, at *11 (Bankr. E.D.N.Y. Mar. 4, 2016) (internal quotation marks omitted) (quoting *AdBrite*, 290 B.R. at 215). As the court in *AdBrite Corp.* explains:

> A continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization. The debtor, however, should not continue in control of the business beyond a point at which reorganization no longer remains realistic. The courts must evaluate losses on a case-by-case basis. Small losses over an extended period of time may be acceptable, whereas large losses in a short period may indicate that rehabilitation is not likely.

*AdBrite Corp.*, 290 B.R. at 215 (citation omitted).

Indeed, persistent losses during the course of a bankruptcy case "come[] at the expense of creditors" and "would weigh in favor of conversion or dismissal of the case." *Adamo*, 2016 WL 859349, at *11 (citing *AdBrite*, 290 B.R. at 215).

Courts have held that the first prong is satisfied "where a Debtor consistently suffers a post-petition negative cash flow and is unable to pay current expenses." *Adamo*, 2016 WL 859349, at *11; *AdBrite*, 290 B.R. at 215 (stating the same). With respect to the second prong, courts have held that the "occurrence of short-term postpetition losses is not grounds to convert or dismiss a bankruptcy case where financial viability is reasonably likely in the near future." *AdBrite*, 290 B.R. at 216. In general, "rehabilitation means to put back in good condition and reestablish on a sound basis [and] . . . signifies that the debtor will be reestablished on a secured financial basis . . . impl[ying] establishing a cash flow from which its current obligations have been met." *Id*. (citations omitted).

2.  Section 1112(b)(4)(B) – Gross Mismanagement of the Estate

Section 1112(b)(4)(B) provides that cause for conversion or dismissal may be established if there is "gross mismanagement of the estate."  11 U.S.C. § 1112(b)(4)(B).  The focus of this provision is on the estate and not the debtor.  As such, the "inquiry cannot include mismanagement by the debtor prior to the bankruptcy filing."  7 COLLIER ON BANKR. ¶ 1112.04[b].  Courts, nonetheless, will consider a debtor's post-petition behavior.  *See, e.g.*, *In re Halal 4 U LLC*, No. 08-15216 (MG), 2010 WL 3810860, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (accounting for the debtor's post-petition failure to accurately represent its interests in the properties at issue and failure to submit monthly operating reports that satisfactorily depict the debtor's income and expenses by property in its decision that gross mismanagement exists); *see also* 7 COLLIER ON BANKR. ¶ 1112.04[b] ("[I]f mismanagement continues after the petition has been filed, it is not in the interest of creditors to permit continuance of gross mismanagement."). In making such a determination, courts will look to the "totality of circumstances."  *In re Sillerman*, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019).

In general, a debtor owes a fiduciary duty to its creditors.  *Halal*, 2010 WL 3810860, at *4 (citing *In re G–I Holdings, Inc.*, 385 F.3d 313, 319 (3d Cir. 2004)).  Such a duty "encompasses a responsibility to keep the court and other parties in interest apprised of the Debtor's business operations."  *Id.* (citation omitted).  Courts have found that post-petition dissipation of assets not of compliance with the Bankruptcy Code and failures to make proper disclosures constitute "gross mismanagement."  *See, e.g.*, *Carrington v. LaMonica (In re Carrington)*, No. 23 Civ. 6430 (AT) (RWL), 2024 WL 69096, at *6–7 (S.D.N.Y. Jan. 5, 2024) (finding that the bankruptcy court did not abuse its discretion in concluding that debtor's unauthorized broker retention, sale of property, use of sale proceeds, and failure to disclose the sale after the fact constitutes gross mismanagement under section 1112(b)(4)(B)); *id.* at *7

(finding that failure to timely file compliant monthly operating reports and failure to cure a lack of disclosure of information regarding income received after the issue was raised also constitutes gross mismanagement of the estate); *Sillerman*, 605 B.R. at 648–49, 657 (concluding that the totality of the circumstances, including the sale of assets without compliance with section 363(b), reflects gross mismanagement).

### C.  Other Grounds for Conversion or Dismissal

#### 1.  Bad Faith Filing

Courts have also dismissed chapter 11 petitions when they have not been filed in good faith. *See, e.g.*, *In re Loco Realty Corp.*, No. 09-11785 (ALG), 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009) (considering dismissal on grounds of bad faith); *In re Canbec Inv. Corp.*, 349 B.R. 915, 918 (Bankr. M.D. Fla. 2006) ("A court may dismiss a Chapter 11 case if a petition for relief was filed without good faith."); 7 COLLIER ON BANKR. ¶ 1112.07 ("[T]he court also may dismiss a chapter 11 case for lack of good faith.").

Good faith "is required to prevent fraud or abuse of the bankruptcy process." *In re Loco Realty Corp.*, 2009 WL 2883050, at *2 (citing *In re Shar*, 253 B.R. 621, 629 (Bankr. D.N.J. 1999)). Courts consider multiple factors when determining whether a filing was made in bad faith, including whether "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights" and the debtor's cash flow. *C-TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) (citations omitted). "[T]he critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy." *In re Loco Realty Corp.*, 2009 WL 2883050, at *3 (quoting *In re 68 W. 127 St., LLC*, 285 B.R. 838, 846 (Bankr. S.D.N.Y. 2002)) (internal quotation marks omitted).

22

2.  Administrative Insolvency

Although section 1112(b)(4) does not list administrative insolvency as cause to convert or

dismiss a chapter 11 case, a court may still consider this factor.  *See AdBrite*, 290 B.R. at 217

("Because the list of grounds for converting or dismissing a chapter 11 case under § 1112(b) is

illustrative, not exhaustive, the court may consider other grounds and use its equitable powers to

reach an appropriate result." (citing *C-TC 9th Ave. P'ship*, 113 F.3d at 1311)).  Courts have

converted cases, in part, on the basis of administrative insolvency.  *See, e.g.*, *Bartmann v. Com.*

*Financial Servs. Inc. (In re Bartmann)*, No. 03-04975, 2004 WL 1057662, at *2 (10th Cir.

B.A.P. May 10, 2004).

**D.  Whether Conversion or Dismissal is in the Best Interests of the Creditors and
the Estate**

Once a party establishes cause, a court must examine whether dismissal or conversion of

a case under chapter 7 is in the best interests of the creditors and the estate.  *See* 7 COLLIER ON

BANKR. ¶ 1112.05[2] ("Once the movant has established cause, the burden shifts to the

respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or

conversion is not in the best interests of creditors and the estate.").  Specifically, section 1112

(b)(2) provides that:

> (2) The court may not convert a case under this chapter to a case under
> chapter 7 or dismiss a case under this chapter if the court finds and
> specifically identifies unusual circumstances establishing that converting or
> dismissing the case is not in the best interests of creditors and the estate, and
> the debtor or any other party in interest establishes that—
>
> > (A) there is a reasonable likelihood that a plan will be confirmed within
> > the timeframes established in sections 1121(e) and 1129(e) of this title,
> > or if such sections do not apply, within a reasonable period of time; and
>
> > (B) the grounds for converting or dismissing the case include an act or
> > omission of the debtor other than under paragraph (4)(A)—

23

> (i) for which there exists a reasonable justification for the act or omission; and
>
> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a case under § 1112(b). *In re FRGR Managing Member LLC*, 419 B.R. 576, 580 (Bankr. S.D.N.Y. 2009); *In re Kholyavka*, No. 08-10653 (DWS), 2008 WL 3887653, at *5 (Bankr. E.D. Pa. Aug. 20, 2008) (quoting H. REP. 595, 95th Cong., 1st Sess. 405–06 (1977)).

The Bankruptcy Code, however, does not define the phrase "best interests of creditors and the estate." 7 COLLIER ON BANKR. ¶ 1112.04[7]. To determine whether dismissal or conversion is appropriate, courts apply a "factor and circumstances" test in determining whether dismissal or conversion is in the best interests of creditors and the estate. *In re Kuvykin*, No. 18-10760 (JLG), 2019 WL 989414, at *6 (Bankr. S.D.N.Y. Feb. 26, 2019). Collier identifies ten such factors:

> (1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.
>
> (2) Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.
>
> (3) Whether the Debtor would simply file a further case upon dismissal.
>
> (4) The ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors.
>
> (5) In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.
>
> (6) Whether any remaining issues would be better resolved outside the bankruptcy forum.
>
> (7) Whether the estate consists of a "single asset".

24

(8) Whether the Debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests.

(9) Whether a plan has been confirmed and whether any property remains in the estate to be administered.

(10) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

7 COLLIER ON BANKR. ¶ 1112.04[7]; *see In re Kuvykin*, 2019 WL 989414, at *6; *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346–47 (Bankr. S.D.N.Y. 2010).

Once cause has been established, dismissal and conversion are not the only two options before the Court.  The Court also has the option of appointing a trustee or examiner.  *See* 11 U.S.C. § 1104(a)(3).  However, such action is considered an "extraordinary remedy." *In re Euro–Am. Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007).

## III.    DISCUSSION

### A.  The Chapter 11 Cases Are Not Bad Faith Filings

The Jefferies Entities contend that conversion of these chapter 11 cases is appropriate as the Debtors have sought bankruptcy protection in bad faith.  In support, the Jefferies Entities assert that (i) the Debtors have no intention of reorganizing; (ii) this case is a two-party dispute between the Debtors and the Jefferies Entities; (iii) the Debtors' filing of these cases was nothing more than an attempt to thwart the Jefferies Entities' threatened litigation; and (iv) the Debtors have made and continue to make false statements in court filings.  (Motion ¶¶ 30–34, Reply ¶¶ 13–23.)  Each is unpersuasive.

*First*, the Debtors have made clear that they elected to implement their wind down in chapter 11.  (*See* Opposition at 22 (indicating that these chapter 11 cases were filed to achieve an "orderly liquidation and distribution of assets . . . in accordance with strict regulatory requirements, continuing fiduciary obligations, and significant expertise").)  This is, indeed, a

proper use of chapter 11 and its protections.  *See In re Soundview Elite, Ltd.*, 503 B.R. 571, 580

(Bankr. S.D.N.Y. 2014) ("[I]t is not bad faith to file a chapter 11 petition for the purpose of a

more orderly liquidation."); *see also* 7 COLLIER ON BANKR. ¶ 1112.07[5][b][i] ("Because the

automatic stay is an important incident of the bankruptcy filing, the bare fact that the debtor

desires to obtain the benefits of this element of bankruptcy relief cannot by itself support a

finding of bad faith.  Rather, the debtor must intend to obtain the benefit of the automatic stay for

an improper purpose, such as merely to frustrate the rights of creditors rather than to reorganize

*or to have an orderly liquidation*." (emphasis added)).

Therefore, the Jefferies Entities' first contention has no merit.  There is nothing improper

about the Debtors seeking chapter 11 to implement a wind down of their businesses and

operations that would enable them to do so in an efficient and orderly manner that also complies

with governing regulations and is in accordance with their fiduciary duties.  *See 68 W. 127 St.*,

285 B.R. at 844 ("When a debtor is motivated by plausible, legitimate reorganization *(or

liquidation)* purposes and not solely or predominantly by the mere desire to prevent foreclosure

or hinder creditors, bad faith is not present in a chapter 11 case." (quoting *In re Clinton

Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987) (emphasis added))).

The Jefferies Entities make much ado about the irrelevancy of the Debtors' business

judgment to the relief they seek, including the Debtors' determination that filing was a

"necessity," their decision to liquidate, the role of the Debtors' regulatory and fiduciary

obligations, and their belief that management is best suited to oversee the wind down of

operations.  (*See* Reply ¶¶ 8–12.)  However, a company's decision to seek bankruptcy at all and

its timing is generally reserved for a company's business judgment.  *See Kittay v. Atl. Bank of

New York (In re Glob. Serv. Grp. LLC)*, 316 B.R. 451, 460–61 (Bankr. S.D.N.Y. 2004) (stating

26

that "in contrast to the laws of some foreign jurisdictions . . . there is no absolute duty under American law to shut down and liquidate an insolvent corporation. The fiduciaries may, consistent with the business judgment rule continue to operate the corporation's business."); *see also In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 577 n.108 (S.D.N.Y. 2007) (indicating that "[s]imply because a company is insolvent does not mean it necessarily will file for bankruptcy" (citing to *Glob. Serv . Grp.*, 316 B.R. at 460)). In any event, proceeding in chapter 11 to implement an orderly liquidation is not bad faith.

*Second*, the Debtors have made clear that the chapter 11 cases involve matters that fall outside the scope of the immediate dispute between the Debtors and the Jefferies Entities, including the Debtors' fiduciary obligations and regulatory control. (Opposition at 23.) Moreover, the Debtors represent that their cases involve other creditors and stakeholders, including lessors, vendors, contract counterparties, employees, and clients. (*Id.*) Generally, the presence of numerous other creditors whose interests should be considered is sufficient to establish that a case is not a two-party dispute. *In re New York Classic Motors, LLC*, No. 21-10670 (MG), 2021 WL 2285440, at *3 (Bankr. S.D.N.Y. June 4, 2021) (concluding that the case was not a two-party dispute as the "Debtor has numerous legitimate creditors whose interests should be considered by the Court").

While the Court has granted the Debtors an extension of time to file schedules and statements of financial affairs for a period of 44 days from the Petition Date, a review of the list of 20 largest unsecured creditors of WMSA, the creditor matrix, and the list of equity security holders of GWA reflects that these chapter 11 cases involve more than simply the Debtors and the Jefferies Entities. (*See Debtors' Motion Extending Debtors' Time to File Schedules and Statements of Financial Affairs and (II) Authorizing Debtors to Redact in Filed Documents and*

*File Under Seal Personally Identifiable Information of Individuals* (the "Motion to Extend Time

to File Schedules and SoFAs," ECF Doc. # 15), Ex. B (containing redacted versions of the list of

20 largest unsecured creditors of WMSA, the creditor matrix, and list of equity security holders

of GWA).)  WMSA's creditor matrix alone spans 41 pages, and the list of WMSA's 20 largest

unsecured creditors includes, in addition to the Jefferies Entities, 18 other creditors whose

scheduled claim amounts range from $371,781.33 to $3,588,490.22.  (*See* Motion to Extend

Time to File Schedules and SoFAs, Ex. B at 2–51.)  Moreover, a review of WMSA's claims

register reflects that creditor David Baker has filed a proof of claim against WMSA in the

unsecured amount of $146,666.67 for "owed severance."  (Case No. 24-10743, Proof of Claim

No. 1-1.)  Therefore, these chapter 11 cases extend beyond the dispute between the Jefferies

Entities and the Debtors.

     *Third*, even if the Debtors' chapter 11 filing was indeed an attempt to thwart the Jefferies

Entities' threatened litigation, the Debtors have also indicated that the lawsuit would have

triggered indemnification obligations.  (Opposition at 25.)  The Debtors submit that preparation

for a bankruptcy filing only began in earnest when "it became evident that an orderly wind down

could not occur outside of court."  (*Id.*)  Accordingly, the Debtors have established that the

bankruptcy filing was not simply solely a delay tactic with respect to the Jefferies Entities but an

overall means to an end to achieve an orderly wind down of all of the Debtors' businesses and

affairs.  Therefore, this assertion is without merit as well.

     *Fourth*, the Jefferies Entities contend that the Adversary Complaint contains misleading

or false statements when it suggested in paragraphs 88 through 92 that the transfers were "not on

account of an antecedent debt."  (Motion ¶ 34.)  However, as the Debtors note, the Jefferies

Entities failed to account for the immediately preceding language in paragraph 91, which states,

"*Subject to proof*, Plaintiffs plead that *to the extent* one or more of the Avoidable Transfers were not on account of an antecedent debt." (Complaint ¶ 91 (emphasis added).) Given the preceding qualifying language, the Jefferies Entities' assertion is also without merit.

Accordingly, the Jefferies Entities have failed to carry their burden of demonstrating cause for conversion. *See AdBrite*, 290 B.R. at 218 (noting that the party moving to dismiss or convert a chapter 11 case "bears the burden of proving that cause exists by a preponderance of the evidence").

**B.  Cause Does Not Exist to Convert the Cases Under Section 1112(b)(4)(A)**

The Jefferies Entities contend that conversion is appropriate pursuant to section 1112(b)(4)(A) since there is a (i) "substantial or continuing loss to or diminution of the estate" and (ii) an "absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Both requirements must be satisfied. *See 1031 Tax Grp.*, 374 B.R. at 93 (citation omitted) (stating that a party moving under section 1112(b)(1) must establish both the "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation"). However, for the reasons discussed below, neither prong is met.

1.  <u>Substantial or Continuing Loss to or Diminution of the Estate</u>

In support of their contention that the Debtors are facing substantial or continuing losses to or diminution of their estates, the Jefferies Entities cite to the Debtors' "needless[] pay[ment] [of] hundreds of thousands of dollars in costs to creditors other than the Jefferies Entities." (Motion ¶ 39.) Exhibit E to the Daraviras Declaration lists these amounts, which indicates that these payments were made on or about March 1, 2024, prior to the Petition Date. (*See* Daraviras Declaration, Ex. E (indicating on March 1, 2024 that the invoices dated the same day "need[ed] to be paid today").) However, in determining whether this prong is satisfied, courts look to a debtor's post-petition predicament, including its post-petition cash flow. *See, e.g., Adamo*, 2016

29

WL 859349, at *11 (indicating that this requirement is satisfied "where a Debtor consistently suffers a post-petition negative cash flow and is unable to pay current expenses"). Accordingly, consideration of the Debtors' pre-petition payments is irrelevant for this requirement.

The Jefferies Entities further assert that proceeding under chapter 11 would result in additional expenses, including costs for hiring professionals for the Debtors, which could result in a situation where the Debtors could potentially incur negative cash post-petition flow with no hope of recovery. (*See* Motion ¶ 39.) Generally, hypotheticals alone are insufficient to satisfy this prong as courts look to whether a debtor has *actually* sustained a loss or diminution in value following the commencement of a case. *See, e.g.*, *Adamo*, 2016 WL 859349, at *12–15 (looking to a debtor's actual negative cash flow in making its determination); *see also* 7 COLLIER ON BANKR. ¶ 1112.04[6][a] (stating that in determining whether "tests whether, after the commencement of the case, the debtor *has suffered or continued to experience* a negative cash flow, or, alternatively, declining asset values" (emphasis added)). Nonetheless, the Debtors have represented that they are still receiving income from obligations relating to their operations while eliminating unnecessary costs. (*See* Opposition at 27.)

Even if the Debtors are currently facing negative cash flow, the Debtors have only been in bankruptcy for barely a month.[4] It is premature to conclude that the Debtors are facing a substantial negative cash flow so severe that it would justify a finding that this prong is satisfied this early on in the case.

Accordingly, the Jefferies Entities have failed to establish that there is "substantial or continuing loss to or diminution of the estate" at this stage to establish cause for conversion to chapter 7 under section 1112(b)(4)(A).

---

[4]    The Petition Date, as noted, is April 29, 2024.

2.   <u>Absence of a Reasonable Likelihood of Rehabilitation</u>

The Jefferies Entities contend that the Debtors' lack of intent to reorganize supports a

finding that this prong is satisfied.  However, "[i]t is permissible in chapter 11 to confirm a plan

of reorganization that contemplates a liquidation."  *In re Nw. Co.*, No. 20-10990 (MEW), 2020

WL 6927661, at *3 (Bankr. S.D.N.Y. Nov. 20, 2020).  Therefore, entering chapter 11 with an

intention to liquidate does not automatically foreclose satisfaction of this prong.

The court's ruling in *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644

B.R. 418, 436 (Bankr. S.DN.Y. 2022) is particularly instructive:

> Notwithstanding the existence of decisions holding that pursuit of a
> business's liquidation does not constitute 'rehabilitation,' the Court
> concludes that here—where the Debtors' business was and is to solicit and
> obtain investor funds, and then invest the funds, and then liquidate
> positions, repay those investors, and then wind down the particular fund in
> question—what Debtors seek to do in this case constitutes "rehabilitation"
> of their business within the meaning of § 1112(b)(4)(A).

Accordingly, the focus is on whether a debtor's objective is to "reestablish [itself] on a

sound financial basis and to free [itself] up to meet . . . current obligations, and to carry out [its]

longstanding business plan." *MatlinPatterson*, 644 B.R. at 436–37.

The Jefferies Entities have not made a sufficient showing with respect to the first prong

and it is also premature to determine whether there is an absence of reasonable likelihood of

rehabilitation.  The Court need not address whether the second prong is satisfied at this time.

The Debtors should be afforded an opportunity to continue in chapter 11 and propose a chapter

11 plan.

**C.  Cause Does Not Exist to Convert the Cases Under Section 1112(b)(4)(B)**

The Jefferies Entities further assert that cause exists to convert these cases to chapter 7

pursuant to section 1112(b)(4)(B) of the Bankruptcy Code as there is "gross mismanagement of

the estate." 11 U.S.C. § 1112(b)(4)(B).  The Jefferies Entities allege that management has not

31

exhibited any intention of maximizing value for the estate as they refuse to pursue the alleged preferential transfers they made to their employees.  (Motion ¶ 43.)  Moreover, they contend that a conflict of interest exists over the Debtors' pursuit of these claims as they are "potentially pursuing claims against themselves."  (*Id.* ¶ 42; Reply ¶ 28.)  The Debtors, in response, have indicated that (i) the Motion was filed one week after the Petition Date and there is no obligation to commence preference actions within that timeframe; (ii) the U.S. Trustee has been unable to appoint an official committee of unsecured creditors; and (iii) the Debtors believe the payments were made in the ordinary course, were contractual or industry standard, and were proper in timing and amount.  (Opposition at 30.)

As with section 1112(b)(4)(A), it is premature to determine that there has been "gross mismanagement" of the estate since the inquiry looks solely to the Debtors' post-petition actions. The Debtors have been in chapter 11 for barely a month.  While the Debtors are not obligated to commence a preference action, they nonetheless have plenty of time to do so if they so choose. *See* 11 U.S.C. § 546(a) (requiring that preference actions must be filed by the later of (a) two years after entry of the order for relief or (b) one year after appointment of the first trustee).  In any event, other parties, as the Debtors have acknowledged, may seek to claw back these amounts.

The Jefferies Entities cite *Matter of Natrl Plants and Lands Mgmt. Co., Ltd.*, 68 B.R. 394 (Bankr. S.D.N.Y. 1986) and this Court's ruling in *In re Klaynberg*, 643 B.R. 309 (Bankr. S.D.N.Y. 2022), to support their contention that management's alleged conflict of interest supports a finding of "gross mismanagement."  (*See, e.g.*, Reply ¶ 28.)  Both of these cases, however, are distinguishable.  The court in *Natrl Plants* noted that a question existed over the debtor's impartiality to pursue preference or avoidance actions in reaching its conclusion that

conversion to chapter 7 to allow for the appointment of an independent trustee would be appropriate. *Natrl Plants*, 68 B.R. at 396. Its decision to do so, however, did not rest on "conflict of interest" grounds alone but also on the "debtor's track record [that] ha[d] been something less than acceptable with respect to the timely submission of monthly operating reports as required by the United States Trustee's Guidelines." *Id.* Thus, it was the combination of these reasons that supported the court's conclusion that the "interests of creditors [would] be jeopardized by allowing the debtor to proceed with liquidation without the benefit of an independent trustee's supervision." *Id.* at 396. In other words, the *Natrl Plants* court still considered the debtor's post-petition actions, which here, in contrast, remain limited and insufficient for the Court to find that conversion to chapter 7 would be appropriate at this time.

As for this Court's ruling in *Klaynberg*, the issue of gross mismanagement was explored solely within the context of determining whether a chapter 11 trustee should be appointed pursuant to section 1104(a)(1). While "gross mismanagement" in a section 1104(a) analysis is similar to that under section 1112(b)(4)(B), this Court granted the motion seeking appointment of a chapter 11 trustee in the *Klaynberg* case seven months after the debtor's chapter 11 petition was filed. *See Sillerman*, 605 B.R. at 656 (stating many of the circumstances that would constitute cause for conversion under section 1112(b)(4), including "gross mismanagement of the estate," similarly constitutes cause for appointment of a trustee pursuant to section 1104(a)); *Klaynberg*, 643 B.R. at 311 (granting a motion for appointment of a chapter 11 trustee in September 2022, approximately seven months after the debtor's petition date of February 11, 2022). Therefore, neither *Natrl Plants* nor *Klaynberg* support the relief that the Jefferies Entities presently seek.

33

Accordingly, there is no cause for conversion for "gross mismanagement" of the estate at this time.

## IV.    CONCLUSION

For the reasons discussed above, the Motion is **DENIED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

Dated:    May 29, 2024
          New York, New York

_____
*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge