**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

WEISS MULTI-STRATEGY ADVISERS
LLC, *et al.,*

Debtors.

**FOR PUBLICATION**

Case No. 24-10743 (MG)

Chapter 11

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER, PURSUANT TO BANKRUPTCY CODE SECTIONS**
**105(A), 363(B), 541(A), AND 1108 AND BANKRUPTCY RULES 2002, 6004,**
**AND 9006 AUTHORIZING THE PRIVATE SALE OF CERTAIN RIGHTS,**
**CLAIMS, AND CAUSES OF ACTION RELATED TO THE PORTUGUESE BONDS**

*A P P E A R A N C E S:*

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for the Debtors*
200 West 41st Street, 17th Floor
New York, New York 10036
By:    Tracy L. Klestadt, Esq.
       John E. Jureller, Jr, Esq.
       Lauren C. Kiss, Esq.
       Stephanie R. Sweeney, Esq.

HERBERT SMITH FREEHILLS NEW YORK LLP
*Attorneys for Jefferies Strategic Investments, LLC,*
*Leucadia Asset Management Holdings LLC, and Jefferies LLC*
200 Park Avenue
New York, New York 10166
By:    Scott S. Balber, Esq.
       Michael P. Jones, Esq.
       Daniel Gomez, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion[1] (the "Motion," ECF Doc. # 277-1) that seeks entry of an order—pursuant to sections 105(a), 363(b), 541(a)(1), and 1108 of the Bankruptcy Code and Rules 2002, 6004 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 5004-1 of this Court's Local Rules, and the Amended Guidelines for the Conduct of Asset Sales (the "Sale Guidelines")—authorizing Weiss Multi-Strategy Advisers LLC ("WMSA"), GWA, LLC ("GWA"), OGI Associates LLC ("OGI"), and Weiss Special Operations LLC ("WSO") and Weiss Multi-Strategy Funds LLC ("WMSF" and, together with WMSA, GWA, OGI, and WSO, the "Debtors") to effectuate the sale and assignment of certain rights, claims, and causes of action related to the Bonds identified on Annex 1 of the Trade Confirm (collectively, the "Bonds") pursuant to terms of the "Upstream Trade Terms" (the "Trade Confirm"), attached to the Archer Decl. (defined below) as Exhibit B (the "Transaction").

Annexed to the Motion is the declaration of Pierce Archer, Chief Operating Officer of the Debtors (the "Archer Decl.") as Exhibit A. A copy of the proposed order approving the Motion is attached to the Archer Decl. as Exhibit A.

Jefferies Strategic Investments, LLC ("JSI"), Leucadia Asset Management Holdings LLC ("LAM Holdings"), and Jefferies LLC ("Jefferies," and together with JSI and LAM Holdings, the "Jefferies Entities") timely filed an objection (the "Jefferies Objection," ECF Doc. # 267) on

---

[1]    On October 31, 2024, the Court entered an order granting the *Debtors' Ex Parte Motion for Entry of an Order Authorizing Debtors to Redact in Filed Documents and File Under Seal Certain Information Related to Sale of Portuguese Bonds* (ECF Doc. # 253). Relatedly, the Court also so-ordered the *Confidentiality Agreement Relating to Debtors' Proposed Sale of the Portuguese Bonds* (the "Confidentiality Agreement," ECF Doc. # 261).

On November 23, 2024, however, the Debtors filed the *Notice of Partial Unredacted Sale Motion, Declaration, and Trade Confirm Related to Proposed Sale of Certain Rights, Claims and Causes of Action Related to the Portuguese Bonds* (ECF Doc. # 277) that contains unredacted versions of the Motion and the Debtors' reply to the Jefferies Objection pursuant to an agreement reached with the U.S. Trustee.

2

November 19, 2024, opposing the relief sought.  The Debtors filed a reply (ECF Doc. # 274) that was subsequently filed on an unredacted basis (the "Debtors Reply," ECF Doc. # 277-5).  A hearing on the Motion was held on November 26, 2024.

For the reasons discussed below, the Court **GRANTS** the Motion and **OVERRULES** the Jefferies Objection.  A separate Order will be entered.

## I.    BACKGROUND

### A.  The Chapter 11 Cases

On April 29, 2024 (the "Petition Date"), each of WMSA, GWA, OGI, and WSO filed voluntary petitions for chapter 11 relief.  (Motion ¶ 3.)  On June 19, 2024, WMSF commenced its voluntary chapter 11 case.  (*Id.*)

The Debtors' cases are being jointly administered, and they continue to operate their businesses as debtors and debtors-in-possession.  (*Id.* ¶ 4; *Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of Chapter 11 Cases*, Case No. 24-10743, ECF Doc. # 51; *Order Directing Certain Orders in Chapter 11 Cases of Weiss Multi-Strategy Advisers LLC, et al. be Made Applicable to Weiss Multi- Strategy Funds LLC*, Case No. 24-10743, ECF Doc. # 120.)

### B.  The Bonds

#### 1.  In General

The Bonds comprise certain retransferred notes that originated from the failure of one of Portugal's largest banks, Banco Espírito Santo, S.A. (in liquidation) ("BES").  (Motion ¶¶ 8–9.) In August 2014, Novo Banco, S.A. ("Novo Banco") was established to take over viable components of BES's business with the remaining non-viable parts remaining with BES.  (*Id.* ¶ 7.)  Certain of the assets transferred to Novo Banco included 52 outstanding series of senior

3

notes.  (*Id.*)  On December 29, 2015 (the "Transfer Date"), Banco de Portugal ("BdP")

retransferred five of these notes in the total amount of EUR2.2 billion (the "Retransferred

Notes") from Novo Banco back to BES.  (*Id.* ¶ 8.)  Each of the Retransferred Notes is governed

by Portuguese law and are virtually entirely owned by foreign investors while the remaining

series of senior notes are governed by English law.  (*Id.*)

The Debtors purchased the Bonds—all Retransferred Notes—in the secondary market,

and the Debtors and their affiliates hold Bonds with an approximate principal value of

EUR41,000,000.  (*Id.* ¶ 9.)  Specifically, as set forth in Annex 1 to the Trade Confirm, OGI holds

approximately EUR25,000,000 of the Bonds (the "OGI Bonds") while non-debtor affiliate Weiss

Multi-Strategies Partners LLC ("WMSP") holds approximately EUR16,000,000 of the Bonds

(the "WMSP Bonds").  (*Id.*)  WMSP's holdings will be included in the Transaction.  (*Id.*)

### 2.  Litigation Surrounding the Retransfer

The retransfer of the bonds resulted in significant losses to investors, and unsurprisingly,

litigation ensued.  (*Id.* ¶¶ 8, 10.)  Various investors, including OGI and WMSP, have pursued

legal action against BdP, arguing that BdP's retransfer decision was unlawful.  (*Id.* ¶ 10.)  In

connection with the OGI Bonds, OGI filed litigation claims in Portugal.  (*Id.*)  Meanwhile,

WMSP, along with other investors, filed a section 1782 request to obtain discovery in the United

States in connection with the ongoing litigation in Portugal.  (*Id.*)  (*See* 28 U.S.C. § 1782.)

Such litigation, the Debtors note, has been ongoing for 10 years and is complex due to the

"different positions of certain of the Bonds . . . and differing views on the potential rights and

recourse arising therefrom."  (*Id.* ¶ 20.)  The Debtors indicate that the litigation in Portugal is

anticipated to continue for at least three more years.  (*Id.* ¶ 11.)  A "first instance decision" is

expected within 12 to 18 months, and thereafter, an expected appellate process up to European Union courts is expected to, at a minimum, take another 12 to 18 months. (*Id.*)

      3.  <u>Valuation of the Bonds</u>

The Debtors submit that valuation of the Bonds and the Retransferred Notes generally is "speculative at best." (*Id.* ¶ 13.) In either scenario—if Bonds are sold before or upon the outcome of the Portuguese litigation—the value of such Bonds is extremely uncertain and the amount and timing of proceeds the Debtors would receive for them is "unknown." (*Id.* ¶ 15.) Presently, OGI's Schedule A/B (ECF Doc. # 74) specifies a value of approximately $5,331,332.00 for the OGI Bonds as of the Initial Petition Date, the value that has been set forth in OGI's books and records for "several years."[2] (*Id.* ¶ 16.) With respect to the WMSP Bonds, the Debtors estimate the value of such bonds to be approximately $3.5 million.[3] (*Id.* at 7 n.2.)

*First*, there is a dearth of market data available to value the Retransferred Notes. (*Id.* ¶ 12.) While a public market in the Retransferred Notes existed before the Transfer Date, no active market has existed for the last several years, and the last disclosed trading prices are now stale. (*Id.*) The Debtors indicate that, on the rare occasion they do trade, such trades are typically done via private transactions. (*Id.*) Thus, the circumstances relating to the trade and pricing are unknown and/or are confidential and, therefore, unavailable to market participants. (*Id.*)

*Second*, other factors complicate the market value determination and analysis. (*Id.* ¶ 13.) There is, at the outset, uncertainty over the timing and amount of any potential recovery once the

---

[2]    The Debtors indicate that this accounts for the last publicly available trade data, which is several years old. (Motion ¶ 16.)

[3]    At the hearing held on the Motion on November 26, the Debtors disclosed that OGI will receive approximately $4.9 million from the Transaction while WMSP will receive approximately $3.37 million for an aggregate total of $8.27 million.

Portuguese litigation has concluded.  (*Id.*)  The Debtors indicate that under Portuguese law and

as a best-case scenario, the Retransferred Notes are expected to have an estimated recovery

amount of 31.7% of the accepted unsecured ordinary claims of the relevant bondholder (even if

no aspect of the Portuguese litigation proves to be successful) (the "Estimated Recovery

Amount").  (*Id.*)

Moreover, the Bonds fall into two categories: (i) Bonds participating in the Portuguese

litigation (the "Litigation Bonds"), and (ii) Bonds that are not directly participating (the "Unfiled

Bonds").  (*Id.* ¶ 14.)  While both the Litigation and Unfiled Bonds are expected to be entitled to

the Estimated Recovery Amount regardless of their participation status in the litigation, holders

of Litigation Bonds may also receive an upside on any additional recovery in excess of the

Estimated Recovery Amount (the "Excess Recovery") in the event the Portuguese litigation is

successful.  (*Id.*)  This Excess Recovery is to ensure that bondholders are not left worse off than

they would have been had the partition between Novo Banco and BES not occur.  (*Id.*)  As to the

Unfiled Bonds, it is unclear how Portuguese courts will treat them.  (*Id.*)  It may be that holders

of Unfiled Bonds will be permitted to file a litigation claim after the fact, which would entitle

them to Excess Recovery, or such recovery would be prohibited—including on the basis that

such claims are time-barred.  (*Id.*)  The Debtors further note that whether interest and/or

penalties would be assessed is also unclear.  (*Id.*)

### 4.  <u>Marketing of the Bonds</u>

Given the complexities associated with the Portuguese litigation, the Debtors believe that

the market for the sale of the Bonds and associated rights, claims, and causes of action is

"limited."  (*Id.* ¶ 20.)  However, the Debtors attempted pre-petition to determine (i) the value the

Bonds under different scenarios; (ii) the timing for realizing such value; (iii) the market for the

Bonds and any associated rights, claims, and causes of action; and (iv) the logistics for any sale, transfer and/or assignment of the Bonds and associated rights, claims, and causes of action. (*Id.* ¶ 21.) In fall of 2023, the Debtors provided their "ongoing analysis on the Bonds and valuation thereof" to representatives of the Jefferies Entities. (*Id.* ¶ 22.)

Moreover, beginning pre-petition, the Debtors have been working with "experienced distressed debt brokers" to initiate a marketing process to gauge potential interest and establish both pricing and valuation of the Bonds. (*Id.* ¶ 23.) The process has involved both contacting and taking calls from potential purchasers in both the U.S. and foreign jurisdictions, brokers, consultants, and other representatives of market participants. (*Id.*)

Since initiating marketing in April 2024, the Debtors have had substantive discussions with at least eight interested counterparties comprised of parties from hedge funds, brokers, and investors. (*Id.* ¶ 24.) These parties include certain current or former holders of Litigation Bonds and Unfiled Bonds. (*Id.*) Specifically, the interested counterparties include:

| Counterparty | Discussions | Outcome |
| --- | --- | --- |
| **Counterparty #1** – Hedge Fund | 4/19/2024 – Discussions re Bonds, Claims, Litigation | No Bid |
| **Counterparty #2** – Hedge Fund | 6/17/2024 – Received call from interested party; Discussions re Bonds, Claims, Litigation<br><br>6/27/2024 – Translated diligence sent for review | No Bid |
| **Counterparty #3** – Counsel to Bondholders | 5/21/2024 – Call with counsel for large creditor group holding similar bonds; Introduced to potential counterparty | No Bid |
| **Counterparty #4** – Counsel to Bondholders | 5/21/2024 – Call with counsel for another large creditor group holding similar bonds | No Bid |

| **Counterparty #5** – Hedge Fund | 5/30/2024 – Discussion re Bonds, Claims, Litigation.<br><br>7/11/2024 – Due Diligence<br><br>8/14/2024 – Offer | Bid – Avg. price 17.25%, representing a bid of 21.25% for Litigation Bonds and 11.50% for Unfiled Bonds |
| --- | --- | --- |
| **Counterparty #6** – Hedge Fund, Possible Joint Investor | 6/23/2024 – Initial contact re potential purchase<br><br>7/1/2024 – Discussions re Bonds, Claims, Litigation and Pricing<br><br>7/31/2024 – Further discussions re size and price expectations<br><br>8/8/2024 – Further discussions, along with another European investment firm joining call as potential partner<br><br>8/9/2024 – Bid for part of holdings, only 25% for Litigation Bond, zero bid for Unfiled Bonds | Part of holdings, only 25% for Litigation Bonds |
| **Counterparty #7** – Hedge Fund | 9/6/2024 – Discussion re Bonds, Claims, Litigation and Pricing | No Bid |
| **Counterparty #8** – Broker/Investor and **Current Proposed Purchaser** | 10/1/2024 – Initial Discussions<br><br>10/22/2024 – Bid – 19.32% for all held Bonds | *Bid – Approx. 19.32% for all Bonds* |

(*Id.* ¶ 25.)

### 5.   Key Terms of the Proposed Transaction

The following summarizes the key and material terms of the proposed transaction, all of which were previously sealed but were subsequently filed on an unredacted basis pursuant to an agreement reached with the U.S. Trustee.

- **Purchased Assets**: The Bonds originally issued by BES and identified on Annex 1 [of the Trade Confirm] (collectively, the "Bonds"), together with all rights, claims and cause of action of each Seller ancillary or related thereto, whether against BES, Novo Banco, S.A., Portuguese Resolution Fund (Fundo de Resolução), Bank of

Portugal, the Portuguese State, any other authority or any other person including without limitation:

- o Liquidation Claims: All liquidation claims of each Seller filed by it (or any predecessor-in-title) in the insolvency proceedings of Banco Espirito Santo, S.A. ("BES") before the 1st Judge of Lisbon Commercial Section of the Lisbon District Court (the "Court of Lisbon"), under proceeding no. 18588/16.2T8LSB (the "Insolvency Proceedings"), including, without limitation, the accepted Liquidation Claims (*Comuns*) identified in Annex 1;

- o NCWO Compensation: all rights and claims arising from the Liquidation Claims, the Bonds and/or the Bank of Portugal's resolution measures for compensation payable by the Portugues Resolution Fund (Fundo de Resolução) under the 'no- creditor-worse-off' principle (as referred to in articles 34(1)(g), 73(a) and 75 of the Bank Recovery and Resolution Directive 2014/59/EU and corresponding Portuguese Legislation); and

- o Portuguese Litigation Claims: All rights, causes of action, challenges, administrative liability actions and litigation claims in the Portuguese civil or administrative courts against the Bank of Portugal, Novo Banco S.A., the Portuguese State or any other authority or person relating to the Bonds, Bank of Portugal's re- transfer decision on 29 December 2015 and /or breaches of Portuguese and EU law in the implementation of the BRRD.

- **Asset Purchase Price**: EUR7,859,383.96, calculated on the basis of a purchase price of 19.32366183% applied to the amount recognized as *Communs* in the Liquidation Proceedings in respect of the Liquidation Claims and Bonds held by each Seller (as set out in the Annex 1).

- **Settlement Date**: As soon as reasonably practicable, provided that: . . .

  (iv) Cash settlement of the Aggregate Purchase Price shall be paid by Buyer to Seller within two (2) business days on the date on which Final Buyer receives a declaration or other satisfactory written confirmation from the Insolvency Officer of BES (acting as registrar in accordance with articles 61(c) and 64 of the Portuguese Securities Code), stating that the Final Buyer has been fully recognized in the Insolvency Officer's registry as the holder of all Bonds pursuant to the direct transfer of such Bonds from each Seller to the Final Buyer. For the avoidance of doubt, cash settlement of the Purchase Price will not be delayed until the actual substitution of Final Buyer in the Portuguese courts.

- **Other Trade Terms**: As soon as reasonably practicable, provided that: . . .

  (xiv) In the event that (x) the Sellers fail to seek US Bankruptcy Court approval of the transactions contemplated herein as a private sale (with the purchase price filed under seal) within 5 business days of the date of these Trade Terms, (y) the US Bankruptcy Court requires a "stalking horse" or other competitive bidding procedure to be

conducted by any Seller with respect to any portion of the Purchased Assets and, without the prior written consent of the Buyer, the provisions of the order entered by the Bankruptcy Court approving the "stalking horse" or other bidding procedures do not approve any portion of the Bid Protection Requirements, or (z) the entry by the US Bankruptcy Court of a Sale Oder (in form and substance reasonably acceptable to the Finaly Buyer) approving the sale of the Purchased Assets to the Buyer contemplated hereby has not occurred within 60 days of the date of these Trade Terms for any reason, then, in case (x), (y), or (z), the Buyer shall be entitled to give written notice to the Sellers that it terminates its continued participation in this Trade upon which no further duty, obligation, liability, owed or due, by the Buyer to the Sellers shall exist, with all such duties, liabilities and obligations being extinguished in full, except with respect to the confidentiality of the transaction set out in Condition 25(a) of the LMA Standard Terms and Conditions for Par and Distressed Trades Transactions (Bank Debt/Claims) ("Terms and Conditions").

(*Id.* ¶ 28.)

6.  The Motion

The Debtors, as an initial matter, argue that the Transaction is within their sound business judgment and should be approved. (*Id.* ¶ 33.) Specifically, they state that a sale of the Bonds would provide them with the necessary liquidity to pay administrative costs without the need to wait for the conclusion of the Portuguese litigation, which may be at least 3 years away. (*Id.*) The Debtors submit that the funds will facilitate their orderly winddown, which they would otherwise be unable to do if they were to solely wait for the incremental value that the Estimated Recovery Amount would provide. (*Id.* ¶ 34.) Moreover, the Transaction, they argue, is in the best interests of the Debtors' estates and their creditors and is a product of arms-length negotiations. (*Id.* ¶ 35.)

The Debtors also assert that a private sale of the Bonds is warranted under Bankruptcy Rule 6004(f)(1), which they argue courts in this District have previously approved. (*Id.* ¶ 37 (citing, among others, *In re China Fishery Grp., Ltd.*, Case No. 16-11895 (JLG) (Bankr. S.D.N.Y. Nov. 15, 2016); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Sept. 20, 2016); *In re Hawker Beechcraft, Inc.*, 2013 WL 144907 (Bankr. S.D.N.Y. Jan. 9,

2012); *In re Dewey & LeBoeuf LLP*, Case No. 12-12321 (MG) (Bankr. S.D.N.Y. Nov. 1, 2012).)
The Transaction, the Debtors believe, would provide the best opportunity to maximize the sale price of the Bonds. (*Id.* ¶ 36.) The cost and time associated with conducting an auction process are outweighed by the value derived from the Transaction as a private sale "in part because the Debtors, after extensive, tailored marketing, believe that there are no other or better bids to be obtained." (*Id.*) The Debtors indicate that they have already sought higher and better offers. (*Id.* ¶ 38.) No such offers were received, and the Debtors do not believe that a public auction would result in a higher and better offer. (*Id.*) Rather, the Debtors assert, a public auction could, in fact, result in a lower offer since the proposed buyer has an "out" in the Trade Confirm that would allow it to terminate the Transaction in the event of, among other things, a public sale process under certain circumstances. (*Id.*)

Finally, the Transaction, the Debtors maintain, constitutes an arms-length transaction with an unaffiliated party that has resulted in a purchase price that is "reasonably equivalent value for the Bonds when taking into consideration the prior marketing process [and] the facts and circumstances of the Bonds." (*Id.* ¶ 40.) The Debtors further seek a waiver of the 14-day stay provided for in Bankruptcy Rule 6004(h) as being necessary to preserve value for the Debtors' estates. (*Id.* ¶ 41.) Immediate transfer of the Bonds, the Debtors argue, would provide them with liquidity to continue in the administration of their estates. (*Id.*)

### 7.  Jefferies Entities' Opposition

The Jefferies Entities, the "indisputably . . . biggest creditors of the Debtors," object to the Motion on three separate grounds. (Jefferies Objection ¶ 1.)

*First*, the Jefferies Entities contend that the Debtors have failed to adequately explain why they elected to not conduct an auction for the Bonds. (*Id.* ¶ 4.) This, they argue, violates

11

the Sale Guidelines, which require a sale "motion seeking approval of the sale should explain why the debtor proposes to structure the sale in such manner" without conducting an auction. (Amended Guidelines for the Conduct of Asset Sales at 2 (*see* https://www.nysb.uscourts.gov/sites/default/files/pdf/Guidelines_for_Asset_Sales.pdf.)) Specifically, they take issue with the Debtors' assertion that an auction would not produce a higher and better bid as the Jefferies Entities are both "willing and able" to provide such a bid. (Jefferies Objection ¶ 6.)  The Debtors' "unfounded belief as to what a potential purchaser may have submitted at an auction, without more, [is] insufficient." (*Id.*)

*Second*, the Jefferies Entities argue that approval of the Motion would "strip [them] of valuable collateral rights" and, therefore, bid procedures should be put into place to permit them to bid for "assets that comprise their collateral." (*Id.* ¶¶ 7–8.)  Both JSI and LAM Holdings assert they hold a first lien security interest in the OGI Bonds, which they believe comprises the Debtors' largest asset. (*Id.* ¶¶ 2, 8.)  Therefore, because of such an interest, the Jefferies Entities maintain that they have right under section 363(k) of the Bankruptcy Code to protect their interests in the collateral by placing a credit bid for such assets. (*Id.* ¶ 8.)  Such a right, they argue, differentiates the Jefferies Entities from other parties that may have an interest in acquiring the Debtors' assets, and the Motion seeks to impair this right. (*Id.*)

The Jeffries Entities argue that any bid procedures should provide for the following: (i) any secured party including, but not limited to, the Jefferies Entities, should be entitled to submit a credit bid for the assets upon which they have a lien (a "Credit Bid"); (ii) to the extent a Credit Bid is made, there shall be no obligation that the secured party making the Credit Bid (the "Credit Bidder") also seek to acquire other assets of the Debtors; (iii) no Credit Bidder shall be obligated to tender a marked copy of the proposed asset purchase agreement showing proposed

changes, modifications and amendments thereto; (iv) no Credit Bidder shall be obligated to meet

the requirements of a qualified bidder; and (v) no Credit Bidder shall be obligated to make a cash

deposit for any portion of the assets which they intend to acquire pursuant to their Credit Bid.

(*Id.* ¶ 9.)

*Third*, the Jefferies Entities argue that because there are no bidding procedures or an

auction, the Motion seeks to sell the Bonds "for amounts that will ultimately result in a creditor

recovery that is less than what the Jefferies Entities are willing to provide for those same assets."

(*Id.* ¶ 10.)  The Jefferies Entities indicate that they are willing to submit the following bid to

acquire the Bonds free and clear:

- cash in an amount sufficient to ensure that the remainder of the Debtors' creditors receive more than they would under the Debtors' proposed sale; and

- a credit bid in an amount equal to what the Jefferies Entities would receive in a distribution of the amount realized by the Debtors' proposed sale.

(*Id.* ¶ 11.)

They further note that while they presently lack sufficient knowledge regarding the

"universe of the Debtors' claims to propose exact figures as to what they propose to bid," the

Jefferies Entities' bid would include:

- an amount of cash (which could be distributed to the remainder of the Debtors' creditors); and

- a credit bid (which would reduce the Jefferies Entities' total claim value).

(*Id.* ¶¶ 12–13.)  The Jefferies Entities indicate that the sum of these two components would

ensure that the remainder of the Debtors' creditors receive a payout greater than what they would

receive if the transaction contemplated in the Motion is consummated.  (*Id.* ¶ 13.)  Accordingly,

they believe that their bid would be in the best interests of all creditors since it would result in a

greater recovery to the remainder of the Debtors' creditors while reducing the Jefferies Entities' claim in the same amount as promised in the Motion.  (*Id.* ¶ 14.)

8.  The Debtors' Reply

The Debtors reject each of the Jefferies Entities' arguments.  They argue, at the outset, that the Motion complies with the Sale Guidelines and note, among other things, that the Jefferies entities were actually offered the Bonds but were uninterested.  (Debtors Reply ¶¶ 2–6.) Moreover, the Jefferies Entities, the Debtors contend, are not entitled to credit bid since their security interest is "actively disputed."  (*Id.* ¶¶ 7–9.)  Even if they were permitted to credit bid— which, if necessary, the Trade Confirm allows—the Debtors believe that the current offer from the proposed Buyer is the "highest offer on the table," and there is "no other better bid for the Bonds."  (*Id.* ¶ 12.)  Accordingly, they believe that the proposed Transaction is the highest and best offer and is in the best interests of the Debtors' estates.  (*Id.* ¶ 17.)

In any event, the Debtors make clear that they would be more than willing to entertain a bid from the Jefferies Entities to the extent such a bid is all cash, subject to the bid protection requirements provided for under the Trade Confirm.  (*Id.*)

## II.    LEGAL STANDARD

Section 363(b) of the Bankruptcy Code governs the sale of assets outside the ordinary course of business.  Specifically, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction.  FED. R. BANKR. P. 6004(f)(1).

Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can articulate a sound business justification for doing so.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 144–45 (2d Cir. 1992) (affirming bankruptcy court's approval of asset sale under section 363(b) because good business reason supported the sale as delay in the sale of assets may diminish their value); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (holding that the standard for approval of a motion under section 363 is whether there is a "good business reason" to support the motion).

Courts have made clear that a debtor's business judgment is entitled to great deference. *See In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011) ("Indeed, the trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets.") (citation and internal quotation marks omitted).  Once a debtor articulates a sound business justification, there "is a presumption that in making a business decision the [decision maker] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (citation omitted).  "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-

interest, or gross negligence.'" *Borders*, 453 B.R. at 482 (quoting *Integrated Res.*, 147 B.R. at 656).

A determination that there are sufficient business reasons to justify a particular sale depends on the facts and circumstances of each case. *See Lionel*, 722 F.2d at 1071–72. However, courts may consider, where relevant, factors such as: (1) the proportionate value of the asset to the estate as a whole; (2) the amount of time elapsed since the filing; (3) the likelihood of proposing and confirming a plan in the near future; (4) the effect of the proposed sale on any reorganization; (5) the sale price to be obtained with reference to any appraisals of the property; (6) alternative uses of the property; and (7) whether the asset is increasing or decreasing in value. *Id.* at 1071.

### III.    DISCUSSION

#### A.  The Transaction is a Proper Exercise of the Debtors' Business Judgment

The Debtors have sufficiently established that the requirements of section 363(b) of the Bankruptcy Code are satisfied.  As noted, there is uncertainty over the value of the Bonds and when the Debtors would receive any funds from a sale of such Bonds, which could take place either before or after the close of the Portuguese litigation that is itself anticipated to be at least 3 years away.  (*See* Motion ¶¶ 15, 33.)  While the Debtors acknowledge that a successful conclusion to the litigation could potentially result in a higher recovery to OGI than the Estimated Recovery Amount, the Debtors have an immediate need for liquidity to assist in their orderly winddown.  (*See id.* ¶ 17.)  But success is not assured.  Meeting the need for liquidity will also enable the Debtors to satisfy their fiduciary duties to act in the "best interests of their advisory clients."  (*See id.* ¶ 18.)  The Debtors have made clear that they lack the financial wherewithal to conduct the winddown process while waiting for any incremental value that the

Estimated Recovery Amount could provide. (*See id.* ¶ 17.) Thus, they submit that valuing and liquidating the Bonds at this juncture would be central to the successful administration of these chapter 11 cases and is in the best interests of the estates. (*Id.* ¶¶ 18, 35.)

Moreover, the Debtors have discussed in detail the extensive efforts taken to market the Bonds, a process that involved experienced brokers and several potential sale counterparties. (*See id.* ¶¶ 23, 26.) The negotiations leading up to the Transaction with an unaffiliated party were arms-length, and the Debtors indicate that they were "uniquely experienced . . . to competently and proficiently engage in [such] negotiations." (*Id.* ¶ 35.) Moreover, the Debtors, in their business judgment, believe that the Purchase Price obtained constitutes "reasonably equivalent value for the Bonds" after accounting for the marketing process, facts and circumstances surrounding the Bonds, and the limited market for such financial products. (*See id.* ¶ 40.) In general, a debtor's business judgment is entitled to "great judicial deference." *Borders Grp.*, 453 B.R. at 483.

Therefore, as the Debtors have articulated a sound business justification, the Court concludes that the Transaction constitutes a valid exercise of the Debtors' business judgment.

### B. A Private Sale is Appropriate

The Motion seeks authority for the private sale of the Bonds. In general, there is no requirement in the Bankruptcy Code or Bankruptcy Rules that an asset sale be subject to a formal auction. *See In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49 (Bankr. S.D.N.Y. 2016) ("More importantly, there is no rule that a debtor's decision to reject a lease be subject to a formal auction: even asset sales are not conditioned on such a requirement, which does not appear in the Bankruptcy Code or Bankruptcy Rules."). Bankruptcy Rule 6004(f)(1) provides, in

relevant part, "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." FED. R. BANKR. P. 6004(f)(1).

Indeed, this Court's Sale Guidelines recognize the propriety of private sales, imposing solely a requirement that a sale motion disclose that the sale is private and explain why the debtor seeks to structure the sale in such a manner and how it is likely to maximize the sale price. (*See* Sale Guidelines at 2 n.2 ("With the exception of providing for such disclosure, these Guidelines do not express a preference for public over private sales as a means to maximize the sale price.), 9 ("Private Sale/No Competitive Bidding. If no auction is contemplated, the debtor has agreed to a limited no-shop or no-solicitation provision, or the debtor has otherwise not sought or is not actively seeking higher or better offers, the sale motion must so state and explain why such sale is likely to maximize the sale price.") Here, the Debtors engaged in a lengthy effort to sell the bonds. The Court does not believe that an auction now would yield greater value for the bonds. While the Court is cautious in approving a private sale of significant assets, particularly where creditors are likely to face a substantial shortfall in any plan distributions, the Debtors have presented a persuasive case for approving the private sale of the bonds at this time.

Here, the Debtors could and did act consistently with the Sale Guidelines in proposing the private sale. The Motion makes explicit in several instances that the sale of the Bonds is a private sale. (*See, e.g.*, Motion at 2–3 & ¶¶ 27, 36, 38.) Additionally, the Debtors explain in extensive detail why they elected a private sale and how it would maximize value for the Debtors' estates. (*See, e.g., id.* ¶ 36 (stating that an auction is not warranted on account of the cost and time associated with an auction process and, after an extensive marketing process, the Debtors do not believe that higher bids will be obtained); *see also* Debtors Reply ¶ 2 (stating that

the Motion outlines the basis for the private sale and that the Debtors have already exhausted

their extensive marketing process).)

Accordingly, the Debtors' reasons for a private sale were adequately outlined in the

Motion, satisfying the Sale Guidelines, and the Jefferies Entities' assertions otherwise are hereby

**OVERRULED**.  (*See* Jefferies Objection ¶¶ 4–5 (alleging that the Motion violates the Sale

Guidelines).)

### C.  The Jefferies Entities Are Not Entitled to Credit Bid

The Jefferies Entities oppose the Court's approval of the Motion, in part, on grounds that

they should be provided with an opportunity to credit bid.  (*See* Jefferies Objection ¶¶ 8–9, 11.)

In general, "[c]redit bidding 'allows the secured creditor to bid for its collateral using the debt it

is owed to offset the purchase price[,]' which 'ensures that, if the bidding at the sale is less than

the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the

price to as high as the amount of its claim.'"  *In re Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr.

S.D.N.Y. 2016) (quoting *In re Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R.

798, 805 (Bankr. E.D. Va. 2014)).  In other words, credit bidding "provides a safeguard for

secured creditors, by insuring against the undervaluation of their collateral at an asset sale."  *Id.*

Section 363(k) of the Bankruptcy Code, which provides a secured creditor with the right

to credit bid, makes clear, however, that the right to credit bid is not absolute:

> At a sale under subsection (b) of this section of property that is subject to a
> lien that secures an allowed claim, ***unless the court for cause orders***
> otherwise the holder of such claim may bid at such sale, and, if the holder
> of such claim purchases such property, such holder may offset such claim
> against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).  Determination of what constitutes "cause," which the

Bankruptcy Code does not define, is made on a case-by-case basis, and denial of credit bidding

based on cause is "within the discretion of the court."  *Aéropostale*, 555 B.R. at 414–15.

Here, the validity of the Jefferies Entities' lien is hotly contested in these chapter 11

cases.  (*See GWA LLC et al. v. Jefferies Strategic Investments et al.*, Adv. Pro. No. 24-01350

(MG), ECF Doc. # 27 (Second Amended Complaint).)  The Debtors commenced an adversary

proceeding against the Jefferies Entities and asserted, among other things, claims to avoid the

Jefferies Entities' security interest as a preferential and constructively fraudulent transfer.  (*See*

*generally id.*)

The Debtors filed the Second Amended Complaint after the Jefferies Entities' moved to

dismiss the Debtors' First Amended Complaint.  In an Opinion and Order dated September 24,

2024, the Court granted in part and denied in part the motion to dismiss.  Most relevant to the

issue here, the Court denied the motion to the extent it asserts a preference claim that seeks to

avoid the granting of security interests under a forbearance agreement dated February 12, 2024,

pursuant to 11 U.S.C. § 547(b).  *See In re GWA, LLC (In re Weiss Multi-Strategy Advisors LLC)*,

No. 24-10743 (MG), 2024 WL 4276161, at *2 (Bankr. S.D.N.Y. Sept. 24, 2024).  "Indeed, the

Jefferies Entities have indicated that Count I should survive dismissal to the extent it asserts a

preference claim that seeks to avoid the granting of security interests under the 2024 Forbearance

Agreement with such relief duplicative of the relief sought in Count III.  *Id.* at *29 (citing Sept.

11, 2024 Hr'g Tr. at 18:2–9 where the Jefferies Entities agreed that "Count 1, to the extent that it

asserts a preference claim seeking to avoid the granting of security interests has been sufficiently

alleged" and noting that the "same is true under Count 3").

In general, "[c]ourts have . . . limited the right to credit bid when the validity of a

creditor's lien is in dispute."  *Aéropostale*, 555 B.R. at 415.  The Jefferies Entities, therefore, are

not entitled to credit bid.  This is all the more so in light of the Court's finding (discussed above)

that the Transaction, conducted as a private sale, is permissible.  *See* 3 COLLIER ON BANKRUPTCY

¶ 363.09 (indicating that a court may deny credit bidding if, among other things, "the sale is being negotiated privately").

The Jefferies Entities also argue that the Motion should be denied as the Transaction would not yield maximum value since the Jefferies Entities are willing to bid in an amount that would result in greater recoveries for the Debtors' creditors. (*See* Jefferies Objection ¶ 14.) However, they also indicate they currently "lack sufficient knowledge of the universe of the Debtors' claims to propose exact figures as to what they [would] propose to bid." (*Id.* ¶ 12.) Without further information, the Jefferies Entities' blanket assertion that they are capable of a better bid is insufficient, and the Jefferies Entities fail to make a persuasive case that delaying the sale of the Bonds is warranted. Presently, the Debtors have an all-cash offer from the proposed Buyer under the Trade Confirm that would provide them with "payment on an expedited basis," which they have an immediate need for. (Debtors Reply ¶ 10.) Moreover, the Debtors disclose that the Jefferies Entities—who possessed knowledge of the Debtors' analysis of the Bonds since the fall of 2023—had already, in fact, been offered the Bonds in an effort to reduce any indebtedness owed but were uninterested. (*Id.* ¶ 5.) The Debtors indicate they would be "more than willing to entertain [an all-cash] bid" from the Jefferies Entities, [which, at this time, the Jefferies Entities have not established they would be able to offer.] (*Id.* ¶ 17.)

Accordingly, the Jefferies Objection in these two respects is hereby **OVERRULED**.

### D.  Waiver of the Stay Under Bankruptcy Rule 6004(h) is Appropriate

Bankruptcy Rule 6004(h) provides that "an order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise." FED. R. BANKR. P. 6004(h).  The rule was intended to provide time for an objecting party to appeal a sale order before such order could be implemented. *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h).  Collier suggests that because the purpose of the

rule is to "protect the rights of an objecting party," a court should eliminate the 14-day stay

period and allow the sale to close immediately in all cases where there has been no objection to

the procedure.  10 COLLIER ON BANKRUPTCY § 6004.10 (16th 2019) (discussing Bankruptcy Rule

6004(h)).  Under this Court's Sale Guidelines, if a debtor seeks relief from the 14-day stay

imposed by Bankruptcy Rule 6004(h), the sale motion must disclose the business or other basis

for such request."  (Sale Guidelines § I.4.D.16.)

Here, waiver of the 14-day stay requirement under Bankruptcy Rule 6004(h) is

appropriate.  The Motion makes clear the basis for the Debtors' request, which is predicated on

the Debtors' need for immediate liquidity.  (*See* Motion ¶ 41.)  Moreover, the Debtors' request

for a waiver is unopposed.  See 10 COLLIER ON BANKRUPTCY § 6004.10 (16th 2019) (discussing

how a waiver of the 14-day stay under Bankruptcy Rule 6004(h) is appropriate where "there has

been no objection to the procedure").

Accordingly, the Debtors' request for a waiver of the 14-day stay is **APPROVED**.

## IV.    CONCLUSION

The Motion is **GRANTED** for the reasons discussed above.

**IT IS SO ORDERED.**

Dated:    November 26, 2024
          New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge